And in my time before the court today, I intend to demonstrate the three errors in the district court's opinion. They are, the district court erred when it concluded that the school district violated its child find obligation. The district court erred when it concluded that the school district did not properly implement OW's IEP. And finally, the district court erred by finding that the parent's private placement fusion was appropriate. I'll turn now to the child find issue. Central to the district court's holding was the erroneous belief that the school district was obligated to expedite a referral to special education. The district court cited 34 CFR 305.34 for the proposition that because OW was demonstrating behavioral problems, the district had to expedite its evaluation. An evaluation only has to be expedited if there is a pending request for an evaluation and a proposed change in placement that will last 10 days or longer. Neither, the final one, did not happen. There was no proposed placement change that would last 10 days or longer. So there was no duty to expedite the evaluation. Right there on the face of the district court's opinion is an error. And everything else in the district court's opinion flows from that error. But let's, let's assume you win on that element. I'm not sure you, it's correct that everything else flows. Because if we did have the request from the mother by October 8th, and we have a district court finding that Dr. something hyphenated Williams, Powell Williams, also had suggested and discussed the importance of a referral for evaluation by October 8th, then the child find finding put aside the expedite rule could still rest on the daily infractions and teacher complaints and other parent complaints, plus a doctor telling you, plus the mother asking you. Why wouldn't the district court's child find not be clear error as to unreasonable after that date? So I think it would be not just a fact finding, Your Honor, that would be under the clear air standard. But it's a mixed question of law and fact, because he's applying the child find jurisprudence, which gives the school district a reasonable time in which to make a referral. That's the Ashley K case out of this court from 2018. Reasonable time necessarily has to encompass the fact that a school district has to, frankly, get to know the child, if you will. You have to see what will work. There's not supposed to be a rush to special education, and merely because a parent requests an evaluation or an outside evaluator makes the suggestion of an evaluation of those ones. Roberts. Roberts. Woody, the child the entire time is at another school. So it's pretty understandable that the school district would have no ability to make a firsthand observation. But in your brief, you say that the most salient child find fact is that the parents did not provide the district with any meaningful information regarding his educational prior to the time he enrolled. But when did he enroll? What's the first day he's in school? He enrolled in August of 2014. Okay. So didn't the racial slurs and profanity begin almost immediately? The behavioral issues began almost immediately. But looking at what the school district knew, they had a letter that stated that the child had ADHD. Now, the second witness to testify below testified that that alone is not — that doesn't create the inference or the knowledge that special education is necessary. There are lots of children who have ADHD who are served — I agree. Put aside Ms. Wright and Dr. Rosen's. But you do still get to October. And at that point, these are daily outbursts of violence and aggression, teachers complaining, other parents complaining. You've got a doctor calling, and you've got a mother asking. How does that aggregation not create a duty to refer as a — that was the district court's fact-finding? The duty to refer, I don't think, is triggered at that point, Your Honor. Okay. Because the duty to refer is based upon suspicion of a disability. And I agree. We knew he had a disability in the form of ADHD. Yeah. And then a suspicion that special education is necessary to address the manifestation of the disability. Okay. But there's also 504 and Section 504 accommodations available. And as this Court noted just recently in the Lisa M. case, there's a complex relationship between 504 and — Well, that may be, to me, the difficult part of this case. Obviously, I know Lisa M. But would you agree with me that, especially with — I'll mispronounce it — Letter to Ferrara, that world, no school district can delay a referral saying, we're choosing to do first in time the general ed. Is that a fair statement of the law? You can't delay it. They work independently or, as the Supreme Court has said, separately. I think that's a fair statement that you can't delay, but then you have to focus on what does delay mean. And you can only inform delay by looking at the suspicion of the need for special education. And just because a parent says, maybe I'd like a special education evaluation, this Court's authority, the D.L. v. Clear Creek ISD case, makes clear that that's not controlling. There's no one person that's going to say that. Well, and that's important for me to hear you say, because it really can't be up to the parents. Let's imagine a parent frequently — these children may be foster children or even homeless children. So they — do you accept that it is 100 percent the school's child find obligation, not parent delay or nonexistence? Is that fair? It's fair. The child find duty rests with the school district. Right. Okay. But in evaluating the application of that child find duty, you have to look at what the school district knew. Yes. What did they know? And we cannot read 504 out of the equation. And so if a school district — I'm just going to interrupt you, only because it's important to me, though. Aren't we still asking — I think it's a very important point you're making, and I'm wrestling with it. But if the district court found that they knew, based on the mother, first-hand observations, and Dr. Williams, wouldn't we have to say that's a clear error? And if so, are you saying any of those portions are clearly erroneous findings? So I think that if the Court were to conclude that the district court made a pure factual finding, then we would be under the clear error standard. And could you win that still? I think I can win that standard. And I think I can win that standard for two reasons. One is, again, we have to look at what the district knew. And when we look at what the district knew, you have to have information about the student. There was information provided by the parent. There was information that was not provided by the parent. The evidence was quite clear that the parent had not provided the history of the child's — And the parent is asking for the 504, like the sister got. But what about the daily outbursts? I mean, this case just sort of screams off the radio frequency in terms of just what the school was seeing. But here's the thing to consider. This is a new student. They have to get to know the student. A child could have daily outbursts in school and behavior, not because they have any qualifying disability, but perhaps they get beaten up every single day on the way home from school. And that could cause them to act out. The school district doesn't know what the reason is until they have a sufficient opportunity to interact with the student, particularly with a new student. And this student was new to the campus. The school district appropriately — excuse me — appropriately used 504 accommodations. It's what the parent requested. It's what the district staff believed was appropriate. And the parent did stop on October 8th and say, it could be autism. We could be something dealing with none of us can handle. And in the end, your team commendably was unanimous in that same finding in January. Not on autism, Your Honor, but that we prefer. No, you're right. That's a good point. So here's the second way I win. And I think this is a matter of law. And I think this could really help clear up the jurisprudence in this area. And it could really help us clear up when we have these fights over child funds, because the standard is reasonable. And that's a very squishy standard. So we have the Woody case, where a four-month delay on getting services. That's reasonable. The Kryowitz case, three — I'm sorry, I got that backwards. Woody, three. Kryowitz, four. Not reasonable. But the state of Texas has regulatory standards for how long a school district has to complete the evaluation and then go to an ARD committee meeting. The school district is entitled to 45 school days to complete the FIE, the full individualized evaluation. Forty-five school days, and then 30 days in which to hold an ARD committee meeting. Those regulatory timelines recognize that special ed doesn't happen immediately. You have to — you have to evaluate. And you don't comply with those once January happens, right? Even, Your Honor, because it's 45 school days, when we look from the time period when limitations accrue, when limitations ran, any claims before 1028.14 are barred under the IDEA's one-year statute of limitations. So we're looking at 1028.14 to the present. When you track from that date, the school district had finished its evaluation. It expedited the evaluation, but held it because it was waiting on the parents' independent evaluation from Monarch. I think appropriately, the school district, knowing there was an evaluation coming, wanted the opportunity to review it and incorporate it in its analysis. So you're saying the record — a record site would be helpful. Maybe it's in the brief. So you're saying the school district paused before referring him because they knew Monarch was being done. Is that — Yes. Yes, Your Honor. And — What did the district court say about that? The district court was really silent on that fact, Your Honor. There's not much discussion about it because the district court focused on the fact that it had to be expedited, erroneously. But then Monarch comes back and says possible autism. Possible autism, correct. And the school district doesn't ever — well, was that when it said, okay, we've got to refer this kid? No. The referral had already been made. The school district's evaluators were working, and the school district determined that autism was not appropriate as part of the ARD Committee's collaborative process, but determined that an emotional disturbance was the appropriate designator. But if you look at the timeline under those regulatory guidelines, the school district — the trigger would have been have the ARD Committee meeting by February 26, 2015. We had it on 3-11-16, two weeks beyond the regulatory timeline. The court should hold that those regulatory timelines create a safe harbor, and that if a school district complies with Texas's regulatory timeline — No case has said that yet. No case has said that. I'm hoping you all will say that. Yeah, but it's delicate how we interplay the state regs with the federal government. It seems like it's been pretty collaborative and working so far, but what about the concern out there that schools could be emboldened to not incur the cost of doing all these gen ed things that just don't work and the child ends up losing a whole year? How do we make sure that's not happening? Okay, so that's really the heart of it, right? The heart of child finders, the concern that a school district will delay. The evidence can go back and show, and the hearing officer gets to make factual findings on when everybody had a suspicion of the need for special education. If you've developed a suspicion that there's a need for special education, it's not dispositive that the parent says, well, maybe, or an outside evaluator says maybe. It has to be viewed in the context. Absolutely, a school district cannot delay a referral once that suspicion has been triggered. Even if they're going to try the gen ed. Okay. That's right. Once the suspicion's been triggered — That all sounds reasonable, and it just gets us back to, is it clear error to say it was anyway? But I need to stop talking because you've got to get to implementation. Well, let me tie up that last piece, and I'll run into implementation real quick. So I think that even setting aside the clear error, because we complied with those regulatory timelines, that's got to be reasonable as a matter of law. And the court should announce that that's a safe harbor. Did you argue that? Yes, we did. We've argued it to this court, and in the district court, we argued that we were timely. Now, we did not argue it quite as bright line that it should be a safe harbor. But I think that's what those timelines should stand for. So moving to implementation, there's no dispute that the IEP was found to be appropriate by the hearing officer, meaning that the school district put together the appropriate programming for the student. The purported failing is on implementation, and that rests on two categories. The first I'm going to deal with quite quickly, and that's the shortened school day. It was clear error for the hearing officer to find that denied OW for inappropriate public education because every single witness who testified, testified it was an appropriate strategy, it had worked in the past, the mom advocated for it, she had no complaint for it, and in fact, fusion went to a shortened school day. But I thought it had to be in writing. There is a proposal on the 20-day plan. And so the IEP can be modified by a writing. Now, here's one of the fundamental problems with what happened in this case. The parents pulled OW out of the district two months into his IEP. The IEP is a year-long document. As this court announced in the Lisa M case, we judged the effectiveness of an IEP retrospectively. We only got to implement it for one-fifth of its temporal length. The only reason, not the only reason, but a child who's referred to special education because they are having behavioral issues, it follows that those who are referred to special education, it's sort of analogous to Rome wasn't built in a day and children aren't educated immediately. It takes time. She didn't sign a writing. There were e-mails among yourselves. Correct. But she didn't. But this is your argument. Correct. And it could have been memorialized in an ARD meeting. And Jan Teeter testified that that was the intent. But when the parents unilaterally pulled OW out, there was never another ARD committee meeting. We never got the opportunity to formalize it or adjust the school day later. And the district was frustrated in its ability to do that. And we really were denied the ability to assess the efficacy of the IEP because it was supposed to go for a year. And yes, we had behaviors at the beginning. But as Fabizarra testified, the trend lines were good on behavior. They were getting better. Frequency was up, but duration and intensity were down. That shows improvement. And that's the only evidence the hearing officer had in front of them. The hearing officer had to accept that evidence, and it would be clear error to draw a conclusion that's not supported by the evidence. One final question. Why haven't you argued that the IEP authorization for use of cool-down areas is equivalent to authorizing timeouts? Or have you argued that? We have argued that, Your Honor. And I think that the, if I may answer that question, I think the critical testimony there is Ms. Martyr's testimony. She was the classroom teacher, and she was asked about timeouts. And while she essentially endorsed that language, her testimony, and Martyr testified at ROA 2894 to this fact, that during the Take 5, Take 10, O.W. was allowed to draw or read as a replacement activity. He was allowed to essentially engage in a preferred activity to replace the negative behavior. The BIP, the Behavior Intervention Plan, which is part and parcel of the IEP, and this is 1805 of the record, provides that strategies are to remove self to a cooling-off area and implementing calming or thinking strategies to frequent breaks and access to preferred activities, e.g. drawing and reading. We've got it, so you are relying on that. We are. And it becomes a magic words argument. Okay. I think you've got time for rebuttal.  Thank you. Ms. Kerr? Good morning, Your Honors. I'm Sonia Kerr on behalf of O.W. and his parents, and his parents are here today. I'd like to address some of the comments of my colleague and essentially three of the key pieces. First, the standard of review in this case is whether there is clear error and whether this Court is really left with a view that a mistake has been made. And on this record, with thousands of pages, with a 104-page hearing officer decision that is very detailed and a hearing officer decision that gave due deference to that hearing officer, there has been no mistake. But the District Court right up front says one of the reasons it was unreasonable not to refer as to October 8th was the three doctors. So I look pretty closely at Dr. Wright, Dr. Rosen, and Dr. Perez-Williams, and I'm not sure those all are as—I mean, what did—start with Dr. Wright. She's arguing for 504, so that's not any support for a special ed. That's what the mother wanted. Correct me if you think I'm wrong. Then we get to Dr. Rosen, but that's a 2012 evaluation. That was the one that took a while to get to the school district. They get it early October. So then it really comes down to the much more involved doctor, Powell-Williams. And as I saw it, but correct me if I'm wrong, it's a cross-examination single remark about we had discussions about special ed. Is that really—it's that one sentence that's the basis for the District Court saying three doctors were urging them to get special ed. referral? No. The testimony from the experts who knew this child was much more extensive than that. Well, cite me the strongest expert advice to this school that the child needs to be referred to special ed before October 8th. Just what's the record cite for the expert that made that the clearest, as opposed to 2012? So what's the best one to support the finding of the District Court that those three together put that October 8th as the notice date? Dr. Powell-Williams at 2355, 2356, and then again on 2359 to 2360, she explains her discussion with Principal Moore. And she explains that Principal Moore wanted to know what interventions were used at the new school. Dr. Powell-Williams had an extensive conversation with him about those, in which he explained that the new school was a therapeutic school, that the child had been in a therapeutic school. And that is a key point, Your Honor. A therapeutic school is not a regular private school. That should have been a huge tip-off for the principal. But they already knew the child's coming from the therapeutic school. They knew that. This is background. And then Dr. Powell-Williams is explaining the kinds of services she provided to him there, which included counseling, which included a small setting, which included preparing for change, which included don't touch this kid, it's not a good thing to even pat him on the back, those types of things. She made herself available. The mother gave the school district her number as she was talking to the staff in late August. No, the mother is Herculean. Pardon me? The mother is Herculean. She's there on campus. It's extraordinary what she did. But she was pressing for what the sister had gotten. The school's being heard 504, and they're accommodating. This is not a Woody example, the school just not there, or the other case that I can't pronounce. And both Mr. W. and Ms. W. explained that they didn't know what special education was. They went with what they knew. And Dr. Wright explained that she didn't know the difference between 504 and special ed. And that's very common in our communities. You know, these psychiatrists... I was looking for the clearest record support for the mother's statement that she didn't know what special ed was. I didn't find it, but you may have it off the... I have it. I have it here. She testified at 3036, 3037, first of all, that she didn't know that Owen had previously been in special ed as a preschooler. And then at 3048, she didn't know she had a choice other than regular education. And then... Okay. But your point would be their point, which it really doesn't matter because a lot of children don't even have parents present. Right. None of this... The point is the school has this responsibility, not the parent. Did the district court rely on the doctors most of all, or would you say this is a case where the simple daily occurrences put any school on notice? I think this is a case, Your Honor, where the amount and the frequency of this child's misbehaviors was so extraordinary that the school district did know. They were suspicious. And the reason we know that is because they refer the child for 504 on September 16, 2014, which is at page 1046. And in their request for their own psychologist to talk with them about OW, they say he exhibits frequent defiance, verbal aggression, his behaviors are unpredictable, occurring with high frequency four or five times a week. And that's at 2019. The behaviors are severely interrupting the teaching and learning of all students on a daily basis. And he spends most of the day drawing, he's highly anxious, he fears rejection, and following the school district's student code of conduct, OW would be suspended out of the classroom daily. So this was a severe case. You don't have always a severe case. This was one of them. And in this case, I don't think it's unreasonable for a hearing officer and a district court to say in the context of this child and this situation, the school district took too long. And the district court was careful. The district court allotted the school district their state law time and still found it took too long and he didn't get an appropriate program for 2014-2015. The school district's argument about what we refer to affectionately as 14-15K, this is the lingo we use, which is when a child is having disciplinary problems and may have a disability, there's no part of this that says the school district has to have taken one action of discipline, such as suspension, or one action of expulsion, okay? It doesn't say that. It just says a child has not been deemed to be eligible for special ed and who has engaged in behavior that violates a code of student conduct. This kid was essentially violating it every day. May assert any of the protections for, in this part, if the local education agency had knowledge and the basis of knowledge is described. And then it also says that the parent has requested an evaluation. So those pieces were met, and that's why the court and the hearing officer looked at that. Now, there's no definition of what expedited means, just like there's no definition of how long reasonable is. You don't depend on expedited in your argument. No. I'm just saying it's — As to your fundamental argument. It's a fundamental — He made two legal arguments as opposed to the clear error. Right.  Do you have thoughts on each of those? Right. And my argument is, I think we still win even if the court says, well, it didn't have to be, quote, expedited officially. Right. I know that. But Mr. Brush just admitted they tried to expedite it. So, obviously, once someone looked at it, they realized this child was really in need of — And he says it's not unreasonable because the accrual date means the stuff before October 28 doesn't count, or it's not unreasonable because there's a safe harbor period. Do you have quick answers to those two points? Yeah. Well, the safe harbor wasn't exactly raised before, but here's what I would say. I think the issue is the individual child. And we know one thing about the IDEA. In the end, every case has to struggle with what is the situation with this individual unique child. And in this individual kid's case, we were seeing behaviors that were out the door. I mean, the child was — it was a safety situation. He was running out. He was hurting other people. He was hurting himself. And under those circumstances, the school district referred him to 504 because, as they argued to the hearing officer, they thought they had to. The mother was asking for 504. But beyond that, a parent can ask for anything. It's not up to the parent. It's up to the school people who know what special ed is, who know what 504 is. Is it relevant that when all of the child find is actually done, Ridgecrest seems to be worse? And at some point in the record, it seemed like the mother said, I'd rather be back in total. Well, that sort of goes to show what parents know and don't know. And that is not the responsibility of the parent to know. Parents just don't know. They try their best, and they ask for what they think. But it presumes that the parent had knowledge. And in this case, Mr. W. testified quite clearly in his testimony — and let me just give you that — that he didn't know. He didn't have any idea. How do you distinguish this case from Woody? Why not just have a numerical rule? Well, a numeri — yeah. Well, a numerical rule is unfortunately not going to work in these cases. There's no bright line. If you review the cases, there's some cases cited in El Paso which preceded Woody and preceded Krawitz. And we have everywhere from six months to three months to 13 months. It's all over the board because it has to be because it's an individual situation. So how do you distinguish Woody? Woody, factually, is just simply very different. The child was not physically in the school where the people could, you know, appreciate what the child's needs were. And the child was sort of presumably generically saying, OK, in that the child was in a private setting that the parent liked. I mean, there's a financial cost, but the child was not at risk as this child was. And the Woody child was in a situation where the delay was in part because they were waiting for records from California and all these kinds of things. That was not the situation here. Ms. W. signed releases on the second day of school. But the Dr. Rosen evaluation doesn't get there until early October for whatever reason. Well, I'm not sure of that. The record is a little bit, so we say sketchy. I'm just wondering, do you want to get to implementation, or do you have other big points you want to make on that? I do want to make one other point about the child fine, which is that the case is really more like the Krawitz case than it is the Woody case. And I think the court should keep that in mind. In addition to which, I did want to give the one cite from Ms. Folger, who was the one I was working with, who said this has been ongoing since the first day of school. She writes that on September 8th, 2014, at EROA 2023. The fact that the statute of limitations is October 28th does not eliminate the ability of the hearing officer to address what happened or the court to address what happened in terms of a remedy. It's an equitable standard under the Reed case. And I just wanted to mention that aspect. May I quickly ask, I want to be clear, are you saying there's a child fine violation because it was not expedited? Is that primary? Because I heard you say that it didn't matter whether it was expedited or not. I just want to see what you're primarily relying on, that it was a violation because it was not expedited? Our view is that whether expedited or not, there was a delay. Whether it had to be expedited or not, there was a delay. And the reason is, although there is this outside timeline, there is nothing that says you have to use all of the outside timeline when you have a child in this situation. And I also think it's important and relevant to consider that we're dealing here with a child who was violating the student code of conduct on a daily basis. That's a safety piece. And that's something that even if you set aside the requirements of 1415K in terms of expedited, it's what's reasonable. They had suspicion from day one. They had ongoing suspicion. So there should not have been delay. And with respect to the Monarch Report as a reason for delay, let's remember that the reason the parents gave for getting the Monarch Report was because they asked the school district to do the special ed evaluation, and the school district refused. So the school district created that delay. With respect to implementation, I do think that both Ms. Martyr's testimony, which is found at 2885 to 2942, and Ms. Bezerra's testimony at 3075 to 3214 are very relevant. Both of them testified about his failure in that program. That program was not working. And it wasn't working because it wasn't following the IEP. The IEP said, use a calm interaction style. Don't create power struggles. Work with this child in terms of positive approaches. But it did say staff can direct him to a cool-down area. Yes, but that is far different than the structure that the AB program had. And the AB program was a traditional leveled program that required children to advance based on how many times they misbehaved and didn't misbehave. He was in level one at the start of that program, and he finished at level one, meaning he did not progress. Ms. Martyr testified he wasn't on track to meet his behavior goals. And she testified he was not able to complete the fifth grade curriculum. She testified that basically it was never discussed at the ARD that they were going to do the approaches that they were doing, the restraints. We agree that the eight incidents of physical restraints, which are documented, were all preceded by positive efforts at behavioral intervention. It wasn't until the positive, calming interventions didn't work that there was an emergency creating the need for restraint, or would you disagree factually with that? I would disagree factually with that. And I would direct the court to Ms. Martyr's testimony. So her testimony was, this is the process we use. My time is up. No, you keep going. The process is, this is what I use for every child. I redirect. I give a warning. I give a second warning. I give a timeout. I give an automatic timeout. I give an automatic isolation. And then we restrain. So this was a one-size-fits-all program. We know the facts of each one. The facts are in there. Here's my most delicate legal question. I shouldn't have saved it to the end. But the letter to Ferrara seems respectful of the Texas Administrative Code at 89-1011 provision. But that code provision says students should be considered for general support services prior to special ed. That is a really delicate issue that it seems like the federal government in Texas have tried to harmonize around. Does that have relevance to this case? I think that the way the district court harmonized it works. The district court said, look, you have, what did he calculate? 78 days from October to January. I'll give you the time frame from January to March under the Texas Code. And then you still have the failed program, which is another 84 days. So you still have about 162 days at this time. That's the failed implementation. But that provision as making it reasonable that they didn't refer till January as opposed to October because they were trying these general ed. things first. They don't get to try the general ed. things first. So you don't think that Texas Code says they do? Oh, I think the Texas Code says they do. And the federal government had said, we're not trying to say that's wrong. We can work with that. This is collaborative. Right. But the Texas, but the federal government has also said, as was recognized in Lisa M., that you can't use those provisions, those regular ed. provisions to delay when you know you should go to special ed. And for some kids, you need to go to special ed. more quickly. And that's the rule. Very clear. Thank you, Counselor. Thank you. Oh, you're right. Thank you. Is this someone else? And that someone else is Ms. Dominguez. May it please the Court, Counsel Christina Torres on behalf of the AMICI. I want to thank the Court for your time this morning. AMICI are both organizations that are dedicated to protecting the rights of students with disabilities. And we are here today because, unfortunately, in the case of O.W., Spring Branch failed to meet its child find obligations under the IDEA. Also unfortunate is that O.W.'s case is representative of a more systemic issue that has been plaguing Texas school districts for many years. And we hope to serve our purpose here as AMICI to provide additional background and to provide context relevant to O.W.'s case. The recent federal investigation by the Department of Education found that in 2004, the TEA enacted a new performance-based monitoring system for school districts, which essentially told school districts to cap the special education identification rate to 8.5%. If a school district didn't meet this restriction, they were open to potential consequences like on-site reviews and sanctions. So this led to school districts to delay or to deny special education rights under the IDEA. One way that schools attempted to stay at or below that 8.5% cap is by providing children who were suspected of having a disability with Section 504 accommodations. Here, Spring Branch did that. They provided him with 504 accommodations, but then delayed in providing O.W. with a referral to a special education evaluation. This is especially important because schools spend very little money on special education evaluations. Some of the sources that we cited are brief. The Houston Chronicle reported that Spring Branch, their budget for Section 504 was about $2,600 for 1,200 students. So that came down to about $2 per student, when otherwise the children would receive thousands of dollars per school year. And I also wanted to note Spring Branch's identification rate fell from 10.9% back in 2004, and it plummeted to 7.2%. So not only did they meet that 8.5% cap, they dipped even lower than what the TEA was requiring from them. In all, we agree that there is no clear error in the district court's factual findings, and we request affirmance. With 20 seconds left, did you hear any legal point made, given your specialty, that you would add emphasis to or correct that any lawyer before you has said? Yes, Your Honor. With regard to the 504 accommodations, that they do not require, it's not required prior to referring a special education evaluation. And, of course, Mom was there daily emphasizing that as well. Thank you. Thank you so much. May it please the Court. Right off the bat, Judge Higginson, you asked about two record citations that I was able to locate. ROA 2788 is the testimony about the expediting the evaluation, and 2815 is the testimony about holding the finish of the evaluation for the Monarch Report. I'd really like to focus, Your Honor, on the, as you characterized it, the delicate legal question, because I think it is a delicate legal question. The State of Texas provides you should try general education first, and frankly, that makes sense. Because it's through trying general education and then trying 504, which is different, that you develop the suspicion in many cases. So these are all individualized inquiries, of course. There are some fact scenarios, a child with Down syndrome, where just by the presentation of their condition, they will require special education, always. It would never be appropriate to try regular education or 504. But in a situation like this, where you have a child who's new, who presents a new set of circumstances, the school district has to have time to figure it out. And figuring it out can involve general ed appropriately. It can involve 504 appropriately. It is not unreasonable to try those steps, particularly in a case here where you had a family that was asking for just that step. And I thought it was interesting, because we're talking about child find, and it comes out, it's not up to the parent. I agree. It's the school district's responsibility. But it's also not up to the parent to determine that special education is required. It's not up to the parents outside evaluators to make those determinations. Consider that the parents outside evaluator, Monarch, came up with a diagnosis of autism, which the hearing officer found was not appropriate. The hearing officer sustained the IEP, which was based on emotional disturbance. There are a lot of footnotes in that 100-page order saying, I sort of think maybe it is, right? There are, which shows exactly why it takes time to evaluate a kid. You have to verify. It takes time to evaluate, but does it take time to refer for evaluation? It does. It's almost a predecessor evaluation. Before you even get to the circumstance of knowing, of having the suspicion, you have to evaluate in the colloquial sense. Who is this new kid who's come into my school, and why are they behaving this way? If, hypothetically, it had been because O.W. was being bullied outside of school, that would never have triggered special education. So you can't automatically infer. It's not a valid inference that because he had behavior, it must mean he has a disability that requires special education. This is especially true when it's here, when the mother's testimony was she told the school district, I think he's acting out so that he can go back to his old school. And that's at 2271 to 2272. Brilliant, yeah. How can the school district, faced with, we have a child who has ADHD, the evidence is undisputed that lots of kids have ADHD and do not need special education. In fact, in the AD versus Alvin ISD case, in the district court opinion, it was written that if you had to refer every kid with ADHD to special education, it would bankrupt the education. But the daily outbursts, even day one, the racial anti-Semitic slurs, I mean, it's pretty egregious. It's horrible conduct. So if we were to say, per se, this can't be delayed, why wouldn't that mean no matter how acting out visible day to day, schools would always be able to try IDE first in spite of just, as you said, Down syndrome type evidence of we need an evaluation. I think they are. How do we avoid the precedent, if you were to prevail, that that's what happens? So I think the precedent is already there, Your Honor. We look to, special education is the exception. And if you look at the IDEA, consider that one of the prongs is the least restrictive environment. Now, this is not a least restrictive environment case, but that's expressing a preference in the IDEA whenever possible for general education and access to general education. A school district has to be able to be afforded some opportunity with a new student. And this is where it's very different from Criowitz. So counsel focused on Criowitz. We both know the case very well. The critical distinction in Criowitz was it wasn't a new student. The student had been at Galveston ISD for a year, receiving 504. And only after the student's crisis, when the school district didn't change anything, were they found to have acted unreasonably. I guess the answer would be from August till October, this student became not new. This student became the best known student at this school. That's probably a fair characterization. He became very well-known. But again, they have to figure out what is that very well-known. And when you have a parent saying, I think he's acting out because he wants to go back, it's not a valid inference to say, but then it must be the other, particularly given all the variables inherent in any human, much less a child who may or may not have special needs. Scalia. Do you, just to exercise, do you have any response to the amici concern, which is a valid concern, if you respect it? Rather than just saying it's not in the record, do you have a thought to us on this? So I do have some thoughts to that beyond it's not in the record. And I would, of course, argue, one, it's not in the record. But again, here's the sort of ironic tension. It's the Individuals with Disabilities Education Act. If Spring Branch ISD had deliberately depressed special education rates for other students, it really wouldn't matter if they got it right in this case. Because the only injury, the only thing that would give O.W. constitutional standing to be here is a discreet injury of his own. They don't get to litigate general policy under the IDEA because they lack standing to do it if they have no injury. And so we bring back to the individual nature of the case and our argument that there's no child find injury. And you've made that argument. And I think that with the proposed safe harbor and to the amicus concern, it doesn't risk school districts running it out. Because all that means is if you meet the timelines, you're safe. If you don't meet the timelines, then we're going to fight about it. Thank you both very much. It's a very sensitive area of law, and you've argued it well for us. Thank you. That's the cases for the day.